**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

**JOHN MCPEAK, ET AL.**,

|   |   |
|---|---|
| : | Case No.   19-cv-03719-JMY |

*Plaintiffs* :

v. :

**DIRECT OUTDOOR**
**PRODUCTS**, LLC, **and**
**SPORTSMAN'S GUIDE, LLC** :

*Defendants* :

<u>**MEMORANDUM**</u>

**YOUNGE, J.**                                              **SEPTEMBER 20, 2021**

Plaintiffs John McPeak and his wife, Robin McPeak, ("Plaintiffs") brought this lawsuit against Direct Outdoor Products, LLC and Sportsman's Guide, LLC ("Defendants") for personal injuries Mr. McPeak sustained after he fell twenty feet to the ground when the cables attached to Defendants' hunting treestand suddenly broke beneath him.  Mr. McPeak has alleged causes of action against Defendants for negligent design and manufacturing defect, strict liability design and manufacturing defect, strict liability and negligent failure to warn, breach of the implied warranty of fitness and merchantability, and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, ("UTPCPL") 73 § 201-1, *et seq.* while Mrs. McPeak brings a loss of consortium claim. Now before this Court is Defendants' Motion for Summary Judgment. (ECF No. 49.)  The Court has considered the submissions made in support of and in opposition to the pending motion and finds this matter appropriate for resolution without oral argument.  Fed. R. Civ. P. 78; L.R. 7.1(f).  For the reasons discussed below, the Court denies Defendants' Motion as to Plaintiffs' claims for strict liability and negligent design defect, strict liability and negligent

failure to warn, and implied breach of warranty but grants the Motion as to Plaintiffs'
manufacturing defect and UTPCPL claims.

I.      **BACKGROUND**

Hunters, like Mr. McPeak, use treestands as a perch to sit or stand at an elevated height so they
can strategically hunt from above while they wait for animals to come within target range.  At
issue in this litigation, is a Marksman Hang-on Treestand (hereinafter, the "Treestand") referred
to as a "hang-on treestand" as this product is affixed by cables that wrap around a tree so that a
platform – that a hunter is able to stand or sit on – can hang onto a tree at an elevated position.
(ECF No. 50 at 2-3.)  The wire cables that came with the Treestand consisted of seven strands,
each containing seven individual wires bonded together to form a single cable, made of zinc-plated
steal (electro-galvanized) which was coated in a black polymer sheath on the exterior of the cable.
(*Id.* at 4.)  This black polymer coating covered the entire steel cable except for .1" to .3" inches of
the length near the crimped ends that meet the pin eye terminals.  (ECF No. 54 at 7.)  The Treestand
utilizes two support cables with one at the top of the support frame to the platform and one at the
bottom, which both wrap around a tree. (ECF No. 50 at 3.)  While setting up and gaining access to
the Treestand requires use of a climbing aid that is sold separately, the Treestand does come with
a safety harness which is meant to attach around the hunter and connect to the tree in the event of
a fall.  (*Id.* at 2-3.)  Nonetheless, Plaintiff used an after-market full-body safety harness which Mr.
McPeak states was a "nicer safety harness." (ECF No. 54  at 24.)

On the day of the accident, Mr. McPeak installed three sets of stick ladders and a couple of
screw-in steps while he remained connected to the tree with his lineman's belt and a safety harness.
(ECF No. 54 at 21.)  He then pulled the Treestand up with a haul line, secured it to the tree with
the original cable straps that came with the Treestand, and pulled down the foot platform.  (*Id.*)

Mr. McPeak climbed back down the stick ladder to retrieve his backpack and proceeded to climb back up all while connected to the tree with his lineman's belt. (*Id.* at 22.) He then unfastened his lineman's belt to allow him to move past the Treestand on the tree as "you have to take the lineman's belt off to get over top of the tree stand." (*Id.*) As Mr. McPeak was in the process of attempting to put the lineman's belt back on and attach his safety harness to the tree, within a "matter of seconds" after stepping on the foot platform, the steel cables broke. (*Id.* at 23.) According to Mr. McPeak and his expert, Chuck Powell, the cables, whose corrosion was obscured by the black polymer sheathing, gave way while Mr. McPeak was on the Treestand releasing the foot platform and allowing it to pivot downward which caused him to fall twenty feet to the ground. (*Id.* at 34.) Mr. McPeak crawled approximately one-hundred and fifty yards to his truck where he called for emergency medial assistance and was taken by ambulance to the hospital. (ECF No. 1 at 5.) At the hospital, Mr. McPeak was diagnosed with a closed displaced fracture of his left calcaneus or heel, compartment syndrome of the left foot and a closed unstable burst fracture of his L2 lumbar vertebrae with herniated L4-5 discs. (*Id.*) He underwent surgery for his foot injury and continued treatment for his spinal injury. (*Id.*)

While Defendants maintain that the Treestand was manufactured in 2011, Mr. McPeak testified that he purchased it in 2014 and that it is not possible that it was purchased before this year. (ECF No. 54 at 4.) Mr. McPeak testified that he would have reviewed the written warnings that came with the Trestand. (*Id.* at 10.) Defendants state that a written instruction manual, labeled "REV D," came with the Treestand recommending consumers to replace the cables every two years. Plaintiffs' dispute this fact noting Defendants' representative testified that he could not be certain which manual Mr. McPeak received, that the Treestand is labeled "REV A," not "REV D," and that an earlier manual associated with "REV A" did not contain this warning. (*Id.* at 11.).

Defendants also state that there was a warning affixed to the Treestand, which Mr. McPeak disputes, instead testifying that he did not recall seeing a sticker affixed to the product at any time. (*Id.* at 12.)  Defendants further maintain that a warning was affixed to the cables themselves, advising users to inspect the cables "for signs of wear, corrosion, and deterioration before each use" and replace every two years but Mr. McPeak again disputes this fact, testifying that he also did not see a sticker affixed with this warning at any time. (*Id.* at 13.)  Defendants appear to suggest that Mr. McPeak left the Treestand out for the entire hunting season each year, but Mr. McPeak testified that the Treestand was stored in his garage, only used when he hunted not at his usual location, and that "most times [it] went up that day and came down." (*Id.* at 14.)  Defendants argue that Mr. McPeak acknowledged the presence of visible rust at the small .1" to .3" inches of the cables not covered in plastic sheathing, but this testimony was based on magnified images shown to him.  (*Id.* at 20.)  Further, Mr. McPeak testified that he believed his cables were "coated all the way down" and "if he could have seen it, it would have given him concern." (*Id.*)  Mr. McPeak further testified that before each use, his practice was to inspect the Treestand including the cables, but that he could not fully inspect the condition of the cables on the day of the accident because they were covered in plastic. (*Id.* at 19.)

What the parties do agree on is that the manual warned that a full-body harness must be used anytime a user of the Treestand leaves the ground.  (*Id.*)  They also agree that the cables were extensively corroded, and that Mr. McPeak never replaced the cables, but Plaintiffs maintain that this corrosion was obscured, and that Mr. McPeak was not warned how to properly inspect the cables or to replace them.  (*Id.* at 18.)

4

## II.   __LEGAL STANDARD__

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment where the movant shows that there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(c). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt*, Ltd., 90 F.3d 737, 743 (3d Cir. 1996). The movant bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 264 F.3d 135, 145 (3d Cir. 2004). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). A factual dispute is "material" if it might well affect the outcome of the case under governing law. *Id*. (citing *Anderson*, 477 U.S. at 248). A court must view the facts and draw all reasonable inferences in the non-moving party's favor. *See In re Flat Glass Antitrust Litig.*, 285 F.3d 350, 357 (3d Cir. 2004); *see also Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002) ("In evaluating the evidence, we are required to view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion."). Nonetheless, a court need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

For claims or defenses where the movant bears the burden of proof at trial, a movant "must show that it has produced enough evidence to support the findings of fact necessary to win." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 237 (3d Cir. 2007).  For claims or defenses that the non-movant bears the burden of proof at trial, a movant can simply point out "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  Once the movant has met its burden of proof, the opposing party "must point to actual evidence in the record on which a jury could decide an issue of fact its way." *El*, 479 F.3d at 238.  In order to survive summary judgment, the party opposing summary judgment must raise "more than a mere scintilla of evidence in its favor." *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). The party opposing summary judgment must cite specific evidence in the record and may not "rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (describing this phase of summary judgment as "put up or shut up time for the non-moving party").  Reliance upon "conclusory, self-serving affidavits [is] insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009); *see also Betts v. New Castle Dev. Ctr.*, 621 F.3d 249, 252 (2010).  In deciding a motion for summary judgment, the court is limited to determining if there is a genuine issue as to a material fact requiring resolution by the finder of fact at trial and does not weigh evidence or determine the truth of the matter. *See Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).

III.  **DISCUSSION**

a.  **Design Defect and Failure to Warn**

Defendants argue that Plaintiffs' strict liability failure to warn, negligent failure to warn, strict liability design defect, and negligent design defect claims fail for lack of causation due to Mr. McPeak's alleged misuse, failure to heed warnings, and assumption of risk, and because

Plaintiffs have not shown a safer "alternative design" for the Treestand. Defendants suggest Plaintiffs' lawsuit simply amounts to allegations akin to "the product is defective because it broke" without sufficient factual allegations. (ECF No. 87 at 10.) Contrary to Defendants' arguments, however, the Court finds that there are significant, genuine issues of material fact for the jury to decide.

Pennsylvania law, which the parties do not dispute applies to this controversy, follows section 402A of the Restatement (Second) of Torts to determine whether a product is defective under a strict liability theory which may be shown in two ways: proof of a manufacturing defect or proof of a design defect. *Tincher v. Omega Flex*., 104 A.3d 328 (Pa. 2014); *Phillips v. A-Best Prods. Co.*, 665 A.2d 1167, 1170 (Pa. 1995); *Dougherty v. C.R. Bard*, No. 11-cv- 6048, 2012 U.S. Dist. LEXIS 100374, at *2 (E.D. Pa. July 18, 2012). Plaintiffs have indicated that they no longer intend to pursue a manufacturing defect claim and thus, this Court will grant summary judgment as to this claim and confine its analysis to Plaintiffs' design defect claim. (ECF No. 53 at 21.) A design defect is one where the manufacturer constructs a product in conformity with an intended design but the design itself is "unreasonably dangerous" to the consumer. *Tincher*, 104 A.3d at 328. A subcategory of a design defect claim can include inadequate warnings, to the user or consumer, of the defect or dangerous propensity of the product. *Donoughe v. Lincoln Elec. Co*., 936 A.2d 52, 61-62 (Pa. Super. 2007). In the strict liability failure to warn context, the Restatement (Second) of Torts, section 402A, recognizes that a product may be rendered "unreasonably dangerous" and therefore actionable because of the absence of a warning, or because the warning that has been given is informationally deficient to warn users of the dangers inherent in the product. *See* Restatement (Second) of Torts § 402A; Dix W. Noel, *Products Defective Because of Inadequate Directions or Warnings,* 23 Sw. L.J. 256, 274-81 (1969). To recover under section

402(A), a plaintiff must establish that: (1) the product was defective; (2) the defect was a proximate cause of the plaintiff's injuries; and (3) the defect causing the injury existed at the time the product left the seller's hands. *Pavlik v. Lane Limited/Tobacco Exporters Int'l*, 135 F.3d 876, 881 (3d Cir. 1998) (citing *Davis v. Berwind Corp.*, 690 A.2d 186, 190 (Pa. 1997).

Plaintiffs also have the option to bring a failure to warn and design defect claim under a negligence theory, which requires: (1) a duty requiring the actor to conform to a certain standard of conduct; (2) a breach thereof; (3) a causal connection between the breach and resulting injury; and (4) damages suffered by the complainant. *Atcovitz v. Gulf Mills Tennis Club, Inc.*, 812 A.2d 1218, 1222 (Pa. 2002).[1]  Traditionally, the difference between a negligence theory and a strict liability theory is that negligence liability focuses on the use of the product, with liability only attaching for the foreseeable use or misuse, whereas a strict liability theory focuses on the condition of the product and the unreasonable dangers inherent in it. *Compare* Restatement (Second) Torts § 388 (imposing duty to warn as to dangers that are known or should reasonably be known) *with* Restatement (Second) of Torts §402A (imposing liability for "unreasonably dangerous" products); *Lance v. Wyeth*, 85 A.3d 434, 458 (noting that in strict liability "the focus is exclusively on the product" while in negligence "the main focus is on the conduct"); *Hartford Mut. Ins. Co. v. Moorhead*, 578 A.2d 492, 501 (Pa. Super. Ct. 1990) ("Pennsylvania courts consistently analyze the negligence/failure to warn and strict liability/failure to warn causes of action separately, treating conduct-related counts apart from product-related counts"); *see also Smith v. Howmedica Osteonics Corp.* 251 F. Supp. 3d 844, 852 (E.D. Pa. 2017).

---

[1] In its Motion, Defendants does not appear to dispute that Mr. McPeak has alleged a breach of a duty, that Defendants had a duty to Mr. McPeak, and that Plaintiffs have pled actual damages in the form of personal injury. Therefore, at issue here is whether there is a causal link between the alleged breach and Mr. McPeak's injury.

Pennsylvania courts once followed an approach to design defect claims, articulated in the Pennsylvania Supreme Court case *Azzarello v. Black Brothers Company*, 391 A.2d 1020 (Pa. 1978), which created a distinctive divide between negligence and strict liability claims "by suggesting that negligence concepts have no place in Pennsylvania strict liability doctrine." *Sullivan v. Werner Co.,* 253 A.3d 730, 740 n. 5 (Pa. Super. Ct. 2021). Under *Azzarello*, use of the term "unreasonably dangerous" was barred in jury instructions for strict products liability claims because the term could "mislead" juries into thinking negligence standards governed. (*Id.*) Instead, the *Azzarello* court required judges to determine if a product "was 'unreasonably dangerous'" before submitting the case to the jury, who was then tasked with deciding if the product "lacked any element necessary for its safe use." (*Id.*)

This changed with the seminal decision in *Tincher v. Omega Flex.*, 104 A.3d at 328, wherein the Pennsylvania Supreme Court abandoned the rigid separation between negligence and strict liability design defect claims, and expressly adopted the Restatement (Second) of Torts, section 402A, including the definition that a defective product is one that is "unreasonably dangerous." In doing so, the *Tincher* court overruled *Azzarello*, did away with the requirement of proof that the product "lacked any element necessary for its safe use" and adopted a composite standard under which plaintiff can satisfy their burden of proof through a "risk-utility test" or a "consumer expectations test." *Tincher* returned the question of whether a product is "unreasonably dangerous," previously decided by the trial court under *Azzarello,* back to the jury to be determined after consideration of the consumer expectation or risk-utility test. *Sullivan v. Werner Co.,* 253 A.3d 730, 741 (Pa. Super. Ct. 2021).[2]

---

[2]*Tincher* left unaddressed questions of how this decision would affect strict liability failure to warn claims, such as whether *Tincher*'s new formulation of strict liability concepts would allow use of negligence-derived defenses.

Under the risk-utility test, a "product is in a defective condition if a 'reasonable person' would conclude that the probability and seriousness of the harm caused by the product outweigh the burden or costs of taking precautions." *Igwe v. Skaggs*, 258 F. Supp. 3d 596, 610 (W.D. Pa. 2017) (citing *Tincher*, 104 A.3d at 389). Factors to determine the risk-utility test are:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
(3) The availability of a substitute product which would meet the same need and not be as unsafe.
(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
(5) The user's ability to avoid danger by the exercise of care in the use of the product.
(6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Id.* Under the consumer expectation standard, "the product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer." *Id.*

Viewing the case sub judice under the consumer expectation test, there is sufficient evidence from which a factfinder could conclude that the dangers of the cables breaking were unknowable or unacceptable to the average ordinary consumer because corrosion was obstructed by the black polymer coating, and it may be common to hunters to expect some visible surface rust under the normal, foreseeable, and intended use of the Treestand. There is also sufficient evidence from which a jury could conclude, under a risk-utility test, that the magnitude of the danger – severe injury or death from falling – outweighed the benefit of the way in which the Treestand was designed – two cables covered in a material that obstructs inspection despite it being the support for the Treestand platform.  A user cannot avoid a danger if they do not know how to look for it. Plaintiffs' expert, Chuck Powell, opined that the design of the cables was unreasonably dangerous

because the black polymer sheath covering the steel cables permitted corrosion to occur without the user being able to detect it.  (ECF No. 53 at 9.)  Specifically, Mr. Powell testified that because the cables were covered in plastic, "you can't tell. You can't see" the metal corrosion." (*Id.*)  This corrosion, according to Mr. Powell, along with the lack of appropriate safety instructions and alternative support for the Treestand, weakened the cables to such a point, that the Treestand was unreasonably dangerous.  While Defendants argue that Mr. McPeak testified that he could observe the corrosion at the .1" to .3" section of uncovered wire near the crimped pin terminal at the end of each cable, his testimony was in response to a magnified picture.  Further, Mr. McPeak testified that had he been able to see the condition of the steel cable, which he was unable to observe, it would have given him concern and pause to consider whether the steel cable may break.  (*Id.*) Plaintiffs' expert, Mr. Powell stated that a potential feasible solution would be to have the cables covered in an anti-corrosive sheathing that permitted periodic inspection.  Another option would be to put prominent warnings attached to the cables themselves and provide an instruction manual that included information on how to perform an inspection particularly in light of grave risk of injury involved.

According to Defendants, however, Mr. Powell's untested alternative design suggestion to have a sheath covering the steel cables with anti-corrosive properties that can be removed and periodically inspected, is insufficient to establish a design defect claim as there is no proof of an alternative feasible design. Unlike Defendants' suggestion, proof that there is an alternative, safer, practicable design for the supporting cables to the Treetand is not precisely the evidence required for the risk-utility analysis. While the risk-utility test is similar and evidence of an alternative design is relevant, the risk-utility test does not require that Plaintiffs' expert engineer the product for Defendants.  The consumer expectation test also does not require proof of an alternative design.

In sum, while some jurisdictions may require evidence as to an alternative design, there is no binding precedent in Pennsylvania that mandates alternative design testing in Pennsylvania design defect cases.

Further, Pennsylvania law is clear that the Court cannot resolve the questions of whether a product was defective and the cause of damage, both of which are at issue in this case, unless "it is clear that reasonable minds could not differ on the issue." *Tincher*, 104 A.3d at 335; *Sikkelee v. Precision Automotive Corp*., 907 F.3d 701, 716 (3d Cir. 2018). Defendants' arguments regarding whether the Treestand was defective and the cause of Mr. McPeak's injury, including whether corrosion was visible in the small, crimped area adjacent to the black sheath-covered cables, are prime examples of issues that are appropriate for a jury to determine. Here, there is sufficient evidence to allow the jury to decide whether the Treestand was "unreasonably dangerous" as it is not clear that reasonable minds could not differ on this issue.

Turning to the Plaintiffs' failure to warn claims, in Mr. Powell's opinion, consumers were not given adequate instructions for the maintenance and use of the Treestand. For a warning to be adequate under Pennsylvania law, it must: (1) accurately and unambiguously convey the scope and nature of the risk, and (2) state the risk with sufficient specificity. *See In re Avandia,* 817 F. Supp 2d 535, 546-47 (E.D. Pa. 2011); *Kohn v. Ethicon, Inc.*, No. 19-40004, 2020 U.S. Dist. LEXIS 24996, at *15 (E.D. Pa. Feb. 12, 2020). While Defendants allege that a user manual came with the Treestand warning that the cables should be replaced every two years, this fact is in dispute. Specifically, Mr. McPeak testified that he did not recall seeing a sticker affixed to the cables. The instruction manual that Defendants rely on with the warnings for two-year cable replacements was named "REV D" but the Treestand itself is labeled "REV A," not "REV D," and the earlier manual associated with "REV A" did not contain this warning. There is also a factual issue as to whether

the warnings were sufficient, even if the Treestand came with the "REV D" warnings as a jury could find, based on the evidence, that a warning to inspect the Treestand or a user manual recommending that the cables be changed every two years does not accurately and unambiguously convey the scope and nature of the risk in light of the danger. (*Id.*)

Defendants further argue that Plaintiffs' claim fails for lack of causation as Mr. McPeak misused the Treestand or failed to observe warnings on an open and obvious risk.  As a result, according to Defendants, Mr. McPeak was the "sole cause of the accident."  (ECF No. 49-1 at 2.) Generally, a defendant cannot use contributory negligence concepts to excuse a product's defect by comparing fault in a strict product's liability action. *Kimco Development Corp. v. Michael D's Carpet Outlets*, 637 A.2d 603, 606-07 (Pa. 1993).  A plaintiff's conduct, however, is not always irrelevant in strict liability as it can relate to whether there is causation between the injury and alleged defective product. *Childers v. Power Line Equipment Rentals*, 681 A.2d 201, 207 (Pa. Super. 1996); *Madonna v. Harley Davidson, Inc.*, 708 A.2d 507, 508 (Pa. Super. 1998.)  To that end, there are limited exceptions to when the plaintiff's conduct may be relevant, including "evidence of a plaintiff's voluntary assumption of the risk, misuse of a product, or highly reckless conduct is admissible insofar as it relates to the element of causation."  *Clark v. Bil-Jax, Inc.* 763 A.2d 920, 923 (Pa. Super 2000).  An affirmative defense in a products liability action is that the plaintiff assumed the risk of his own conduct which is defined as an apprehension of a specific danger, "followed by a conscious decision to tempt fate and accept what fate may bring, which then occasions injury," and it is a complete bar to recovery.  *Bullman v. Giuntoli*, 761 A.2d 566, 570 (Pa. Super. 2000).  To grant summary judgment based on a plaintiff's alleged assumption of the risk it must first be concluded, as a matter of law, that the party consciously appreciated the risk that attended a certain endeavor, assumed the risk of injury by engaging in the endeavor

despite the appreciation of the risk involved, and that the injury sustained was, in fact, the same risk of injury that was appreciated and assumed. (*Id.*)

First, Defendants' claim that Mr. McPeak misused the Treestand by failing to replace the cables every two years as required, by causing the deterioration, or by using the Treestand when it had observable deterioration. Defendants have not offered undisputed evidence of an explicit warning of the need to replace the cables every two years.  As previously discussed, whether or not Mr. McPeak received a warning to replace the cables, is a genuine issue of material fact for the jury to decide.   Defendants claim Mr. McPeak exposing the Treestand to outdoor elements over the course of eight years was the true cause of the accident, but again, there is testimony calling this account into question. Critically, the date of purchase of the Treestand is disputed and Mr. McPeak's testimony suggests that the Treestand was only used when hunting outside his normal location, was stored in his garage, and generally, was taken down the day it went up. Defendants also point to the fact that Mr. Powell's testing "demonstrated that the corrosion protection provided by the zinc coating was effective for the application for eight years," but that lends credence to Plaintiffs' argument that the polymer sheathing was designed in a manner to render it unreasonably dangerous.  (ECF No. 49 at 8.)

According to Defendants, Mr. McPeak should have also been able to appreciate the risk due to observable brown rust in the .1" to .3" inch section where the black polymer sheath covering the steel cables meets the pin eye end. However, whether the corrosion was observable from this small section is ultimately a factual, jury question as reasonable minds could differ. *Ford v. Jeffries*, 379 A.2d 111, 114 (Pa. 1977) (The determination of whether a Defendants' conduct was the proximate cause of a plaintiff's harm is one for the jury if the jury could reasonably differ on the issue.). While Defendants' expert George Saunders opined that a lay user should know that the

cables are no longer safe upon the "first sign" of rust, it does not take expert testimony for a jury to consider, based on common knowledge, that brown surface rust may be visible on many metal surfaces shortly after contact with environmental elements such as the rain. Indeed, Nash McPeak, Mr. McPeak's son and an experienced hunter, testified that brown rust is typically visible on every tree stand from the weather, because tree stands are not painted. Whether the rust was apparent to Mr. McPeak, if he could have appreciated the risk based on the appearance of rust, and whether his injury was of the type appreciated and assumed are factual issues. For instance, in light of the testimony, a jury might consider whether a user is unable to distinguish immediate, surface rust from corrosion on the Treestand given that it can be expected to rust under the reasonable, foreseeable use of that product. And if a jury finds that this risk could not be appreciated, then the jury could also conclude based on the evidence that the supportive cables, particularly in light of the potential danger, must be capable of full inspection and that the Treestand did not provide adequate warnings that educate hunters.

Defendants also argues that although Mr. McPeak was using a full-body safety harness, lineman's belt, and lifeline device at the time of the accident, his failure to remain "double-attached" when he unclipped the lineman's belt – which he alleges he needed to do, to get over the top of the Treestand – was the proximate cause of his injuries. Defendants' argument on this ground, however, misapplies Pennsylvania law as for proximate cause to exist, Defendants' conduct need not be the sole cause, but a "substantial factor" which is found when a defendant's conduct creates a "force or series of forces which are continuous and active operation up to the time of harm." *Dudley v. USX Corp.*, 606 A.2d 916, 923 (Pa. Super. 1992) ("Proximate causation is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm."); Restatement (Second) of Torts § 433(b) (noting that a defendant's negligent conduct will be found

to be a substantial factor if it has "created a force or series of forces which are in continuous and active operation up to the time of the harm"). Once a plaintiff has established facts from which a jury could reasonably conclude that the defendant's actions were a "substantial factor" in bringing about the harm "the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence." *Hamil v. Bashline,* 392 A.2d 1280, 1284 (Pa. 1978) (quoting *Carlson v. A. & P. Corrugated Box Corporation*, 72 A.2d 290, 293 (1950)). Defendants' own expert, Mr. Saunders, admits that Mr. McPeak's failure to double attach his harness was not a factor that caused or contributed to the failure of the support cables. Here, the evidence is sufficient to show that a break in the cables due to corrosion obscured by the black polymer sheathing and lack of adequate warnings were a "substantial factor" in bringing about Mr. McPeak's injury. Whether Mr. McPeak would have been suspended in the air, rather than falling to the ground had he been "double-attached" when the Treestand cables broke does not destroy proximate causation or relieve Defendants of liability.

Ultimately, Defendants' arguments present jury questions as it requires examining the credibility of testimony along with reviewing the physical evidence as it relates to the risk-utility calculus, the consumer expectation test, causation, and Defendants' affirmative defenses. To remove this determination from the jury would be contrary to *Tincher*'s expressed intent to provide juries with greater, rather than less, ability to decide if an unreasonably dangerous defect exists in a product. Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Plaintiffs' claims under both strict liability and negligence for design defect and failure to warn.

**b. <u>Breach of Warranty</u>**

Defendants argue that Plaintiffs' claims for an implied warranty of fitness and implied warranty of merchantability must fail because Plaintiffs have failed to establish a design defect claim for the Treestand. The Third Circuit Court of Appeals has endorsed the general understanding that breach of implied warranty of merchantability and the rule of strict products liability in the Restatement (Second) of Torts § 402A are "essentially the same." *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 94-95 (3d Cir. 1983); *Reese v. Ford Motor Co.*, 499 Fed. App'x 163 (3d Cir. 2012).  Having already concluded that Plaintiffs' design defect strict liability claim is cognizable and after considering Defendants' narrow argument that Plaintiffs' implied warranty claims fail simply because it believes Plaintiffs' design defect claim fails, the Court declines to grant summary judgment as to Plaintiffs' claims for implied warranty of fitness and merchantability.

**c. <u>Pennsylvania Unfair Trade Practices and Consumer Protection Law</u>**

Under the UTPCPL, an unfair or deceptive act or practice means "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have." 73 P.S. § 201-2 (4)(v). The "catchall" provision of the UTPCPL prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding…" 73 P.S. § 201-2(4)(xxi).  Under the UTPCPL a plaintiff must "show that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation." *Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, 955 F. Supp. 2d 452 (E.D. Pa. 2013).  Mr. McPeak cannot show "justifiable reliance" as he never alleges that he received any information upon which he relied. All he argues is that there is an

17

issue of fact as to whether "Plaintiff relied on Defendants' expertise and experiences and whether he was provided the proper warnings" but points to no evidence in support of his conclusory statement of justifiable reliance. (ECF No. 53 at 22.)  The claims in this case are also not about Defendants engaging in conduct that has the capacity or tendency to deceive.  Rather, Mr. McPeak alleges that Defendants did not adequately warn him as to the need to replace the cables or how to inspect them, and that cables were defective because they obscured the ability to observe the true extent of the corrosion. That is a failure to warn and design defect claim, not a consumer protection act claim. Accordingly, the Court will grant the Defendants' Motion for Summary Judgment as it pertains to the UTPCPL claim.

### d.  Loss of Consortium

Defendants' sole argument as to Mrs. McPeak's claim for loss of consortium is that it is derivative of Mr. McPeak's tort claims, and thus, must be dismissed if all his claims are dismissed. Because the Court has not dismissed all of Mr. McPeak's claims, Defendants' motion as to Mrs. McPeak's loss of consortium claim will be denied.

## IV:  CONCLUSION

For the reasons discussed above, the Court will deny Defendants' Summary Judgment Motion as to Plaintiffs' claims for strict liability and negligent design defect, strict liability and negligent failure to warn, and implied breach of warranty but grants the Motion as to Plaintiffs' manufacturing defect and UTPCPL claims.

**IT IS SO ORDERED.**

BY THE COURT:

/s/ Judge John Milton Younge

Judge John Milton Younge